ORIGINAL

Robert E. Thurbon SBN 133617
Erin E. Holbrook SBN 210081
Thurbon & McHaney, LP
2356 Gold Meadow Way, Suite 160
Gold River, California 95670
Telephone: (916) 636-1840
Facsimile: (916) 638-7530

Attorneys for Plaintiff

FILED
FEB 26 2007
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CLYDE G. STEAGALL, INC.,

Plaintiff,

vs.

THE UNITED STATES OF AMERICA,

Defendant

Case No. 07-130-C

COMPLAINT

## COMPLAINT

1. Plaintiff CLYDE G. STEAGALL, INC. ("STEAGALL") is a corporation, formed and organized and operating under the laws of the State of California and maintaining its principal place of business in Loomis, County of Placer, State of California. Plaintiff is a contractor that has, in the past, entered into and successfully completed contracts with the United States.

2. Defendant is the National Aeronautic and Space Administration ("NASA"), which was a party to the Contract at issue and the owner of the Project.

## JURISDICTION

3. This Court has jurisdiction of this action under 28 USC §1491 and 41 USC §601 et seq. (The Contracts Disputes Act of 1978).

## NATURE OF THE CASE

4. On or around November 2001, Clyde G. Steagall, Inc. entered into Contract No. NAS2-02037 with NASA for the fabrication and installation of a 13.8kV/4160V Power Distribution System at the NASA Ames Research Center in Moffett Field, California ("Contract").

5. On or about March 4, 2002, Clyde G. Steagall, Inc. entered into a subcontract agreement with Rexel Pacific ("REXEL") pursuant to which REXEL was required to provide materials pursuant to Specification Sections 16121, 16124, 16131, 16141 and 01300 of the Contract ("Subcontract").

6. Pursuant to the Subcontract, REXEL was required to furnish all submittals, drawings and samples as required by the plans for the Project on or before April 15, 2002.

7. Specification Section 16121 required REXEL to "provide electrical distribution switchgears, circuit breakers, and appurtenant work, complete and operable, in accordance with the Contract Documents." This section covers the 13.8-kV Medium-Voltage Switchgear for the Project.

8. Pursuant to Specification Section 16124 REXEL was to provide medium-voltage (MV) cable for the Project. Specification Section 16131 covering the 13.8-kV Primary Unit Substations, required REXEL to "provide the primary unit substation, complete and operable, in accordance with the Contract Documents."

9. In addition, REXEL was required to "furnish and coordinate all major components of the substation, such as air terminal chambers, step-down transformers, secondary non-segregated phase bus, and secondary voltage 4.16-kV switchgear."

10. The Contract Documents also provided that the primary unit substation was to be manufactured by Cutler-Hammer, General Electric, or Square D. Finally, Specification Section 16141 relates to the medium-voltage motor control centers (MCC). Pursuant to this section, equipment was to be integrated with Section 16131, 13.8-kV Primary Unit Substations.

11. REXEL entered into an agreement with Square D to provide the materials required under

its Agreement with STEAGALL for the Project.

12. Square D in turn entered into an agreement with another company, IEM, to provide component parts, namely the primary unit substation.

13. Delays occurred on the Project due to IEM's inability to perform under its contract with Square D due to IEM's bankruptcy filing. Because of IEM's inability to perform, Square D was required to find another supplier to supply the primary unit substation. Square D then entered into a contract with PIC to provide the component parts that IEM was to provide initially.

14. In or around October 2003 PIC informed Square D that it was also unable to perform on the Project due to the fact that PIC had been sold and was relocating out of state and no longer had the capability to perform on the NASA Project.

15. As a result Square D was required to supply the primary unit substation itself.

16. Steagall immediately informed NASA of this development as soon as it was made aware of the situation itself. As a result of these turn of events, REXEL failed to timely provide the services required under the Agreement and the Project was delayed.

17. Steagall kept NASA routinely informed at all times of these issues and made every attempt to deliver timely.

18. Further delays were caused on the Project based on various other problems and outlined as follows.

19. On or about November 20, 2002, NASA issued a work suspension order to STEAGALL on the DI Water Pump Electrical Pad which was not lifted until November 26, 2003, one year later, at which time Steagall was directed to demolish and remove the already installed conduit and to re-install the conduit according to the plans and specifications.

20. In the time period between November 2002 and November 2003, Steagall met with NASA representatives multiple times in an effort to work out a remedy but NASA continually denied any solutions presented by Steagall.

21. For example, Steagall was instructed to provide an "acceptable work plan and layout of the conduits that Steagall planned to remove and replace". However, requiring that Steagall submit an acceptable work plan and layout served only to delay the project further since NASA rejected everything submitted by Steagall anyway.

22. For further example, the notice to proceed was issue on November 20, 2001 and NASA asked for submittals at a pre-construction meeting on December 5, 2001. Pursuant to the Contract, Submittals were not due until 30 days from the notice to proceed. Steagall responded that no submittals were delivered due to the short notice of the meeting date and the fact that no purchase orders were issued by Steagall until the notice to proceed was issued to avoid the situation where equipment would be ordered and the project not go forward. In addition, the submittals were ready to be delivered within three weeks after the notice to proceed, pursuant to the terms of the Contract, however, the COTR informed Steagall that he would not approve the submittals and to not even bother submitting as the COTR did not approve of the manufacturer, even though the manufacturer was designated in the specifications.

23. Once it was finally agreed that the manufacturer would be Square D, Steagall informed NASA that there was an approximate 10 week lead time on submittals. The COTR requested that Steagall deliver submittals on sections of the equipment as they became available to Steagall, rather than to wait to submit all at once. However, when this was done NASA objected stating that the submittals were incomplete, even though Steagall was following NASA's instructions.

24. Steagall continually requested meetings between the parties involved in order to resolve some issues, however, NASA continually refused those requests.

25. NASA continually rejected submittals and change orders without specifically stating the reasons for rejection, yet expecting Steagall to reply and resubmit with no guidelines to follow, only to be rejected again. For example, in a letter dated September 3, 2003 from George

Williams, it is stated that the revised schedule is deficient and points to a particular task that is missing from the schedule. Mr. Williams then goes on to say that there are other omissions that will be addressed in future correspondence, even though the Contract required that comments on submittals be returned within 12 calendar days from submission. Despite Mr. Williams' failure to address all omissions and other problems with the submittals, Mr. Williams demanded that Steagall submit a definite work plan. Without knowing all the problems with the submitted schedule, it was impossible for Steagall to adequately address them and submit a definitive work plan that would be approved by Mr. Williams. Mr. Williams then gave Steagall two days to respond.

26. Mr. Williams consistently would disapprove submittals and require certain changes, only to point out new and different changes the next time he received submittals.

27. There were also issues with the construction schedule that was submitted by Steagall as George Williams had a different view of what the schedule should be than was projected by Steagall. Steagall worked with Mr. Williams to come up with a working schedule.

28. In a letter dated April 10, 2003 NASA stated in response to a work plan provided by Steagall as requested, "You do not address what your plan of action will be if the remedies you have provided are not approved. You need to perceive all possibilities that have and will effect the completion of this project and compile a plan of action for each, i.e., providing another plan of action, if your proposed fix does not get approved." It was also stated that the project was two months behind schedule, yet it took NASA one month to respond to Steagalls responses to NASA'S requests.

29. On May 21, 2003 NASA corresponded with Steagall stating that they had one chance to convince NASA not to default them. NASA requested that everything be submitted all together including: 1) complete submittals and submittal register with a timeline; 2) an accurate construction schedule that properly reflects all construction activities including rework items; 3)

a remedy for the conduits that were incorrectly installed; 4) a complete and adequate submittal package for the Substation Building Enclosure that includes a complete Seismic Calculation package; 5) a usable facility that meets all of NASA's requirements as defined by the contract; 6) a narrative why NASA should not terminate Steagall's contract for default.

30. On June 3, 2003 Steagall responded stating reasons why the Government should not default Steagall on its contract. In response to partial submittal packages, Steagall stated that this method was approved by George Williams, therefore Steagall forwarded switchgear submittals in June, July and August of 2002.

31. A complete set of submittals was then put together for review in October. The full set submitted in October was compiled from the three previous partial submittals. When the package was returned in November Steagall was alerted to substantial changes that were made that were never pointed out or changed in earlier returned submittals. These changes created changes in the manufacturer's scope of work and created extra costs that were added to the project.

32. Steagall also raised the issue that it had submitted two change requests, one in March 2003 and one in April 2003, and NASA had not responded to either. Steagall pointed out that without the approved changes, Steagall was unable to provide revised factory drawings or provide NASA with a production schedule.

33. In addition, Steagall reminded NASA that they had tried to schedule meetings with the construction group and were continually denied. Steagall provided a fix for the conduit which NASA stated was unacceptable, however, NASA refused to get together and talk to work out a fix that was acceptable to both parties. Steagall also reminded NASA that the manufacturer of the switchgear that was initially involved in the Project filed bankruptcy and was unable to complete their contract. This required finding another manufacturer to build the structure. And finally, Steagall reiterated that there were several open RFIs and unprocessed EC's that despite

numerous requests by Steagall, had never been answered or processed by NASA as far back as September 2002. NASA's failure to agree to meet with Steagall in order to address some of these issues was a major contribution to the issues escalating to the point where default of Steagall's contract was contemplated.

34. In a letter dated July 16, 2003, Mr. Williams addressed a submittal package and stated generally, "the Government has concluded that it to be seriously deficient in both detail and content." Mr. Williams goes on to enumerate a few specific errors and then states, "The above examples are but a few of the issues that were found in the Steagall submittal package by the reviewing staff." Mr. Williams then recommends Termination for Default and states that there is no benefit to requesting additional re-submittals.

35. On August 6, 2003 a meeting was held between the parties to address issues that had arisen and on August 11, 2003 Mr. Williams sent a letter to Steagall reiterating the issues discussed and the deadlines given at the meeting. Mr. Williams specifically set out seven issues as follows: Conduit, Seismic Drawings, Prosecution of the Work, Completion Schedule, Provide a Purchase Order for the Switchgear, As-built Drawings and Identification of Foreman/Superintendent. Steagall responded to six of the seven issues by the given deadlines. The final issue dealt with remobilizing on the site.

36. On August 12, 2003, Mr. Williams requested that Steagall send an employee to the site to open the job trailer in order to retrieve the D.I. Water Pump Substation Project As-built Drawings. On August 13, 2003 Steagall requested a badge for the driver to go by the trailer and pick up the drawings. The drawings were delivered to NASA on August 14, 2003.

37. On August 25, 2003 Mr. Williams sent a letter to Steagall regarding the Medium Voltage Test Submittal submitted by Steagall on August 6, 2003 and identified several issues with the submittal. Steagall worked with the manufacturer to address the issues identified by Mr. Williams.

38. In a letter dated August 26, 2003 to Steagall, Mr. Williams requested further explanation in response to the Purchase Order between Rexel Pacific Electric Supply Company and Steagall. Mr. Williams stated signatures, dates of signatures and the total amount of the Purchase Order were missing as well as a complete list of items. Mr. Williams requested that the additional information be provided.

39. In a Memorandum dated August 29, 2003 from Mr. Pargett regarding the Seismic Re-Submittal Package, Mr. Pargett stated that the submittal package was being rejected and cited twelve reasons. However, Mr. Pargett then stated, "This should not be considered a complete list of errors in the submittal. Sufficient corrections were needed that justified rejection of the submittal and the review was concluded due to time limitations. Additional specification deviations may be found in corrections to these comments, or to previous work that was not noticed in prior reviews." Mr. Williams, in a cover letter enclosed with the review comments by Mr. Pargett requested that Steagall respond to the issues as quickly as possible. Steagall forwarded the comments to Square D to review and respond to.

40. Also on August 29, 2003, Mr. Williams forwarded review markups of the Plan View Drawing of Conduit Stubup Locations. Mr. Williams stated that the drawing was rejected for lack of information and detail. Mr. Williams also stated that a Clyde G. Steagall, Inc. submittal transmittal sheet with submittal designation was not included with the submittal and should have been.

41. Also on August 29, 2003, Mr. Williams forwarded a rejection of the submittal package for the PIC building that was submitted by Steagall on June 5, 2003 stating that Steagall failed to satisfy most of the outstanding construction installation issues experienced throughout the Project. Aside from the fact that there was a 2 1/2 month period of time that elapsed between the time that Steagall made the submittal and when Mr. Williams responded with his comments. The comments made by Mr. Williams did not affect the production of the project, however,

rather than requesting that corrections be made, Mr. Williams simply rejected the submittal in its entirety.

42. In the beginning of September 2003, Mr. Williams sent many letters to Steagall requiring responses by Steagall within a one to two day turn around.

43. For example, on September 3, 2003 Mr. Williams sent a letter to Steagall rejecting the revised schedule submitted on August 11, 2003. Mr. Williams stated that the revised schedule was deficient and cited as one of the deficiencies that the installation of the 15kV medium voltage cable from the SF6 switch to the switchgear was missing from the schedule. Mr. Williams then went on to state that other omissions existed but would be addressed in future correspondence. Mr. Williams also stated that Steagall had not submitted detailed construction drawings illustrating exact conduit placements in the electrical pad. Mr. Williams requested a response in less than two days.

44. Also on September 3, 2003, Mr. Williams sent Steagall an Emergency Change Order directing Steagall "to provide engineering and manufacturing configuration changes that increase the horse power rating for five (5) motor controllers located in the D.I. Water Pump Substation. The motor controllers' rating is to be increased to 2000 h.p." The Change Order also required Steagall to provide NASA with a complete set of drawings illustrating all affected changes to the submitted drawing package, a breakdown, including costs of the disciplines and time for the change and a complete list, including costs, of materials, equipment and hardware affected by the change.

45. In a letter dated September 8, 2003 from Mr. Williams to Steagall, Mr. Williams made allegations that Steagall had ignored previous correspondence outlining what was required in order for work to resume on the electrical pad, which was subject to a Suspension of Work order. The alleged ignored correspondence was dated July 16, 2003 and related to the rejected submittal package, August 29, 2003 and related to Plan View drawing of Conduit Stubup Locations,

August 29, 2003 and related to PIC and Steagall Drawing Package and September 3, 2003 Scheduled Re-Mobilization. Although the submittal package was rejected on July 16, 2003, Steagall did not receive specific comments from NASA until August 29, 2003. As for the issue regarding the Conduit stub up locations, Steagall did not receive comments until September 5, 2003 and it was Steagall's opinion that it was compliant with the contract drawings. With regard to the drawing package, again Steagall did not receive the comments on the drawings until September 5, 2003, two days before Steagall was to remobilize. Also on September 8, 2003, one day prior to Steagall's scheduled remobilization, Steagall received an email from Mr. Williams stating that the Work Suspension Order from November 20, 2002 remained in effect and the Government would not allow work to take place on the electrical pad. In this correspondence Mr. Williams states the unresolved issues as being: detailed pad drawings, conduit layouts to all locations to and in the equipment and transformers and resolution to seismic issues. Never before had Mr. Williams raised any issues regarding seismic requirements and transformers. Rather, Mr. Williams waited until the day before the scheduled remobilization to raise these issues and even then, only briefly without any detail as to what the specific issues were.

46. On October 3, 2003 you sent a letter to Steagall stating that NASA was considering terminating the contract for default and that it was necessary to determine with Steagall's failure to perform arose from causes beyond its control and without fault or negligence on Steagall's part. Although Steagall was not defaulted off the Project, NASA has continued to assess liquidated damages against Steagall, despite the fact that the delays were beyond Steagall's control and were without fault or negligence by Steagall. Therefore, this assessment is in error and the amount withheld should be released to Steagall for payment on the Project.

47. On November 26, 2003, a year after it was issued, the suspension of work was lifted and NASA directed Steagall to demolish and remove the alleged incorrectly installed conduit and re-install the conduit according to the plans and specifications.

48. On December 30, 2003 Steagall received a letter from Mr. Williams stating that there were three items missing from the most recent submittal package received by NASA on December 24, 2003, specifically: (1) pad details showing the method in which the raised floor beams were to be anchored to the concrete floor; (2) conduit layout drawings with details depicting raised floor beams and the respective correlation with the equipment conduit cutout compartments; and (3) transformer pad drawings and details that included conduit sizes and placement and concrete pad drawings with seismic calculations. Steagall was given until January 9, 2004 to respond to the issues and provide the information.

49. On January 14, 2004, Steagall received NASA's comments on the seismic study submitted by Steagall. It was stated that the submittal could not be accepted until certain items were fully corrected and updated calculations and drawings were reviewed. There were nine comments regarding the study and why it was not acceptable. It was also stated that this was not a complete list of the errors and that additional specification deviations may be found in corrections to the comments or to previous work that was not noticed in prior reviews.

50. On January 12, 2004 Steagall received correspondence from Mr. Williams requiring that Steagall provide additional information it its Electrical Equipment Pad Detail regarding overall dimensions and thickness of the plates, anchoring methods and tie-in details to the concrete slab and detailed drawings illustrating exact locations anchoring plates will be placed.

51. On January 23, 2004 NASA sent further correspondence to Steagall regarding the cable test results, in response to correspondence sent by Steagall September 15, 2003. Mr. Williams identified several issues with the cable test submittal and requested that Steagall inform NASA of its decision on how to deal with the issues by January 28, 2004. On January 28, 2004 Steagall responded to NASA stating that they had contacted some testing companies as well as the manufacturer of the cable and were told that the testing requirements issued by NASA were beyond the capabilities of the testing companies and that the tests were better performed at the

factory level so new cable was being provided.

52. On January 27, 2004 Steagall received further comments regarding the Transformer Seismic Request in response to comments received by NASA from Steagall regarding the seismic study on February 4, 2003, almost a year prior. NASA requested further information by January 30, 2004.

53. On January 30, 2004 Steagall received correspondence from Mr. Williams stating that no further documentation or proposals from Steagall relating to changes to the Project would be accepted or reviewed. Mr. Williams further stated that Steagall had not complied with the emergency change order dated September 2, 2003 as well as direct Steagall to make a change to the Project. This new change by NASA came at a time when Square D had already submitted the design changes and changed the drawings, and would now possibly be required to go through the process again causing further delays and costs, all due to NASA.

54. On February 2, 2004 Steagall received correspondence from NASA listing items that were allegedly delinquent by Steagall. The delinquent items were as follows: (1) Pad drawings details and calculations showing anchoring method of raised floor beams to the concrete slab; (2) Pad layout not submitted with correlating equipment/conduit openings to the raised floor beams; (3) Transformer pad layout with conduit installation drawings missing; (4) Seismic Submittal Red Lines with comments have not been returned; (5) Transformer Seismic detail with calculations missing, Steagall resurrected an unacceptable sketch and calculations package. It was stated that Steagall had two working days to provide Mr. Williams with confirmed delivery dates of all the outstanding issues and provide a revised construction schedule, otherwise Steagall would face default.

55. On February 5, 2004 Steagall responded. With respect to Item 1, Steagall responded that while NASA contends that the due date on this item was January 9, 2004, Steagall did not get notification of the issue until January 12, 2004. Steagall had submitted it to Square D for

answers. With respect to Item 2, Stegall responded that the package was sent to NASA on the due date of January 9, 2004. With respect to Item 3, Steagall responded that the package was sent to NASA on the due date of January 9, 2004. With respect to Item 4, Steagall responded that all required information had been sent to NASA on the due date, January 9, 2004. With respect to Item 5, Steagall responded that the 4 days over a holiday weekend given to Steagall to meet the deadline on this issue was not enough time.

56. On February 6, 2004 NASA responded with drop dead dates for the delinquent items. One of the deadlines stated was for detailed drawings for the concrete pad on March 4, 2004. Another deadline was for the seismic submittal due February 17, 2004.

57. On February 19, 2004 Mr. Williams corresponded with Steagall stating that the submittal was received but he was disappointed that the concrete pad drawings were not also included. The deadline set by NASA for the drawings was not until March 4, 2004.

58. Steagall responded to Mr. Williams' every request, only to be given additional and different guidelines and requirements at the time of each response. Steagall found it impossible to fully comply with Mr. Williams' requests.

59. On or about January 24, 2006 NASA corresponded with STEAGALL stating that a total of $457,320 had been assessed against STEAGALL for liquidated damages for 888 days delay on the Project.

60. On or about October 6, 2006 STEAGALL submitted a Request for Contracting Officer's Decision requesting that the liquidated damages that had been assessed by NASA against STEAGALL be eliminated, or at least reduced, due to factors beyond STEAGALL's control.

61. On or about January 30, 2007 NASA submitted its Contracting Officer's Decision and denied STEAGALL's claim for reduced or eliminated liquidated damages.

62. NASA has failed to specify the specific delays for which the liquidated damages have been assessed and has only stated that STEAGALL was 352 days behind schedule in 2003, 366

calendar days behind schedule in 2004 and 174 calendar days behind schedule in 2005, for a total of 892 days, for a total amount of damages of $459,380.00.

63. NASA based the assessment of liquidated damages on FAR clause 52.211-12 and the liquidated damages section F.5 on Page F-3 of the Contract.

64. Pursuant to the liquidated damages clause, "If the Contractor fails to deliver the supplies or perform the services within the time specified in this contract…" the Contractor shall pay liquidated damages for every calendar day of delay.

65. Also pursuant to the liquidated damages clause of the Contract, "The Contractor will not be charged with liquidated damages when the delay in delivery or performance is beyond the control and without the fault or negligence of the Contractor as defined in the Default-Fixed-Price Supply and Service clause in this contract."

66. The Default-Fixed-Price Supply and Service clause provides in pertinent part as follows, "If the failure to perform is caused by the default of a subcontractor at any tier, and if the cause of the default is beyond the control of both the Contractor and subcontractor, and without the fault of negligence of either, the Contractor shall not be liable for any excess costs for failure to perform, unless the subcontracted supplies or services were obtainable from other sources in sufficient time for the Contractor to meet the required delivery schedule."

67. Many of the delays suffered on the Project were not caused by STEAGALL but were in fact beyond the control and without the negligence of STEAGALL and STEAGALL should not be held responsible for such delays.

**COUNT I**

68. Plaintiff realleges and incorporates by reference as though fully set forth herein Paragraphs 1-67, inclusive, of this Complaint.

69. On or around November 2001, Clyde G. Steagall, Inc. entered into Contract No. NAS2-02037 with NASA for the fabrication and installation of a 13.8kV/4160V Power Distribution

System at the NASA Ames Research Center in Moffett Field, California ("Contract").

70. On or about January 24, 2006 NASA corresponded with STEAGALL stating that a total of $457,320 had been assessed against STEAGALL for liquidated damages for 888 days of delay on the Project.

71. NASA has failed to specify the specific delays for which the liquidated damages have been assessed and has only stated in its Contracting Officer's Decision that STEAGALL was 352 days behind schedule in 2003, 366 calendar days behind schedule in 2004 and 174 calendar days behind schedule in 2005, for a total of 892 days, for a total amount of damages of $459,380.00.

72. NASA based the assessment of liquidated damages on FAR clause 52.211-12 and the liquidated damages section F.5 on Page F-3 of the Contract.

73. Pursuant to the liquidated damages clause, "If the Contractor fails to deliver the supplies or perform the services within the time specified in this contract…" the Contractor shall pay liquidated damages for every calendar day of delay.

74. Also pursuant to the liquidated damages clause of the Contract, "The Contractor will not be charged with liquidated damages when the delay in delivery or performance is beyond the control and without the fault or negligence of the Contractor as defined in the Default-Fixed-Price Supply and Service clause in this contract."

75. The Default-Fixed-Price Supply and Service clause provides in pertinent part as follows, "If the failure to perform is caused by the default of a subcontractor at any tier, and if the cause of the default is beyond the control of both the Contractor and subcontractor, and without the fault of negligence of either, the Contractor shall not be liable for any excess costs for failure to perform, unless the subcontracted supplies or services were obtainable from other sources in sufficient time for the Contractor to meet the required delivery schedule."

76. Many of the delays suffered on the Project were not caused by STEAGALL but were in fact beyond the control and without the negligence of STEAGALL and STEAGALL should not

be held responsible for such delays.

77. NASA breached the contract by assessing liquidated damages against STEAGALL in violation of the contract provisions for delays that were beyond the control of STEAGALL or its subcontractor and without the fault or negligence of either STEAGALL or its subcotnractor.

78. INTERSTATE has made demand to NASA for payment for the remainder of the contract in the amount withheld as liquidated damages, but NASA failed and refused and still fails and refuses to pay the sum, and the whole sum remains due, owing and unpaid.

79. As a result of NASA'S breach of the contract STEAGALL has suffered damages in the approximate sum of $459,380 plus attorneys fees and costs.

**COUNT II**

80. Pursuant to 28 USCS 2412, the Equal Access to Justice Act, unless expressly prohibited by statute, a court may award reasonable costs, expenses and attorneys fees to the prevailing party in a civil action against the United States. Therefore, Plaintiff respectfully requests that the Court award attorneys fees in costs in an amount to be determined by later motion.

WHEREFORE, Plaintiff requests relief as follows:

1. For damages resulting from NASA's breach of contract;
2. For an equitable adjustment to the Contract for the extra work performed, in an amount to be determined at trial;
3. For attorney's fees and costs incurred in pursuing this action;
4. For such other and further relief as the court may deem just and proper.

Dated: February 20, 2007

THURBON & McHANEY, LP

By: ______________________

ERIN E. HOLBROOK for
ROBERT E. THURBON
2356 Gold Meadow Way, Suite 160
Gold River, CA 95670
(916) 636-1840
Attorneys for Plaintiff
CLYDE G. STEAGALL, INC.